NOT DESIGNATED FOR PUBLICATION

No. 115,791

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CRAIG D. EASTERBERG,
*Appellee*.


MEMORANDUM OPINION

Appeal from Clay District Court; WILLIAM M. MALCOLM, judge. Opinion filed January 6, 2017. Affirmed.

*Richard E. James*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Robert (Rocky) D. Wiechman, Jr.*, of Wichita, for appellee.


Before BUSER, P.J., ATCHESON and POWELL, JJ.


ATCHESON, J.:  The State contends the Clay County District Court erred in granting Defendant Craig D. Easterberg's motion to suppress evidence in his prosecution for driving under the influence. We agree with the district court that an unattributed police report generically describing a white pickup truck with two male occupants as possibly involved in a hit-and-run collision did not furnish constitutionally reasonable suspicion to stop Easterberg and his wife 2 hours later in their white pickup. We, therefore, affirm the district court.

1

About 1 a.m. on October 25, 2015, Clay County Sheriff's Deputy Hank Stellner received a dispatch report originating with the Concordia police department requesting law enforcement officers to be on the lookout for a white pickup with two male occupants that "possibly had been involved" in a collision in Cloud County. According to the dispatch, the pickup had been going south on Meridian Road. The occupants were described as "possibly intoxicated." The dispatch indicated the white pickup had an Ottawa County license tag but provided no other identifying information. Upon receiving the dispatch, Stellner drove the length of Meridian Road, which forms part of the boundary between Clay and Cloud Counties, without seeing a white pickup. Stellner then resumed his usual patrol duties.

Around 3:15 a.m., Stellner saw a white pickup northbound on Indian Road and began to follow it. The truck was traveling mostly on dirt roads and kicked up dust, so Stellner could not determine if it had an Ottawa County tag. He saw the silhouettes of two people in the pickup. After following the truck for some time, he pulled it over.

Upon approaching the pickup on foot, Stellner recognized the driver as Easterberg, who lived near him. He also detected the smell of alcohol and believed Easterberg had been drinking. Stellner began investigating Easterberg for a violation of K.S.A. 2015 Supp. 8-1567.

The Clay County Attorney charged Easterberg with DUI and refusing a breath test. Easterberg filed a motion to suppress any evidence obtained as a result of the stop. The district court held an evidentiary hearing on the motion to suppress in March 2016 at which Stellner was the only witness. In explaining his decision to stop Easterberg, Stellner described what we have already outlined. Stellner testified that he pulled Easterberg's pickup over to determine if it was the vehicle associated with the dispatch report from the Concordia police department. On cross-examination, Stellner agreed that nothing about Easterberg's driving prompted him to believe Easterberg had committed a

2

crime. Stellner testified Easterberg drove below the speed limit and toward the center of the unimproved dirt roads. But Stellner said he did not find that imprudent or suspicious, given the time of night and the nature of the roads. Stellner testified he thought it "unusual" a driver would travel on dirt roads, especially at night, rather than use parallel improved roads. That opinion, however, did not figure in Stellner's decision to stop the white pickup.

A couple of weeks after the hearing, the district court informed the lawyers in a telephone conference that Easterberg's motion to suppress had been granted. The district court filed a short journal entry confirming the ruling. The State has filed an interlocutory appeal challenging the district court's decision, as provided in K.S.A. 2015 Supp. 22-3603.

We begin our analysis with some settled legal principles. When a law enforcement officer stops a motor vehicle, he or she effects a seizure of the driver and any other occupants within the meaning of the Fourth Amendment to the United States Constitution. The nature and scope of a traffic stop has been equated to an investigatory seizure of the type first outlined in *Terry v. Ohio*, 392 U.S. 1, 21-22, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Field*, 252 Kan. 657, 659, 847 P.2d 1280 (1993). An investigatory or *Terry* stop is constitutionally justified when, based on the facts, "an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *State v. Pollman*, 286 Kan. 881, 889-90, 190 P.3d 234 (2008) (cases cited); see also *Navarette v. California*, ___ U.S.___, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014). In other words, the officer "must have articulable facts sufficient to constitute reasonable suspicion[.]" *State v. Kotas*, 35 Kan. App. 2d 769, 773-74, 134 P.3d 677 (2006). See *Terry*, 392 U.S. at 21 (The officer "must be able to point to specific and articulable facts" that "reasonably warrant" the stop.). Thus, the court is to ask "whether [the officer] articulated specific facts which would support a reasonable suspicion" that the person stopped had violated or

was in the process of violating the law. *State v. Marx*, 289 Kan. 657, 674, 215 P.3d 601 (2009).

The determination is ultimately measured based on what an objective officer would discern in those facts, not how the officer making the stop has characterized them or has subjectively weighed them. *Terry*, 392 U.S. at 21-22 ("[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). In sum, then, the proper analysis turns on whether the facts available to the officer furnish reasonable suspicion supporting an objective decision to make the stop.

In reviewing a district court's ruling on a motion to suppress, we apply a bifurcated standard. We accept factual findings if they are supported by competent evidence having some substance and exercise plenary review over legal conclusions based upon those findings, including the ruling on the motion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The State bears the burden of proving a search or seizure to be constitutionally permissible by a preponderance of the evidence. *Patterson*, 304 Kan. at 272; *State v. Pollman*, 286 Kan. at 886. Here, the material facts all derive from Stellner's testimony at the suppression hearing and are not disputed. What remains is functionally a question of law. *Patterson*, 304 Kan. at 274.

The issue here is straightforward: Does a generic description of a motor vehicle's color and general body design provide reasonable suspicion for a traffic stop some 2 hours after the wanted vehicle has been identified to law enforcement officers as traveling on a particular roadway? The resolution is equally straightforward: No, that's not good enough. We think the proposition approaches a self-evident application of Fourth Amendment law. That is, a law enforcement officer could not hours after

4

receiving a report that a blue sedan was the getaway car in a holdup stop each and every blue sedan he or she might see. The description would have to be considerably more tailored with details markedly narrowing the field of possible matches—a make and model coupled with an unusual bumper sticker or a distinctive pattern of damage or rust or, better yet, a full tag number—to support a constitutionally reasonable seizure. Hours removed from the report, a vehicle type and color alone are too remote or stale to furnish reasonable suspicion for a traffic stop. See *United States v. Laughrin*, 438 F.3d 1245, 1247-48 (10th Cir. 2006) (stale information does not furnish reasonable suspicion for traffic stop). This seems particularly so given the mobility of motor vehicles. Here, for example, to credit the suspicion as reasonable, we would have to conclude, first, the driver of the wanted pickup passed by Stellner either after driving around rural Cloud and Clay Counties between 1 a.m. and 3 a.m. or after stopping somewhere in the vicinity for those 2 hours *and*, second, no other white pickups might be on the road. Those circumstances, especially in combination, seem decidedly unreasonable conclusions. We suppose, without deciding, that some kinds of cars might be so unusual in Clay County that a description limited to a make and color might provide reasonable suspicion 2 hours later—a silver Rolls Royce or a black Lamborghini, perhaps. But not a white pickup. Stellner acted on stale information and, thus, on a hunch rather than on a constitutionally acceptable reasonable suspicion. See *Terry*, 392 U.S. at 22 (law enforcement officer's "hunches" insufficient to justify even brief investigatory detention).

A contrary application of the Fourth Amendment would present troubling possibilities. The Fourth Amendment, of course, explicitly shields "persons" from unreasonable government searches and seizures. A dispatch report of a suspect in a bank robbery in progress as "a black male of average build" could not alone provide a constitutionally adequate basis to detain and question anyone fitting that description some 2 hours later. That would likely create a constitutionally impermissible dragnet. See *United States v. Sanchez*, 519 F.3d 1208, 1214 (10th Cir. 2008) ("The tip did not provide

5

the officers with excessive discretion to stop and search a large number of citizens—this was not a dragnet.").

In addition, for purposes of Easterberg's motion to suppress, the information relayed from the dispatcher to Stellner must be treated as an anonymous citizen tip regarding the white pickup's involvement in a hit-and-run collision. The State offered no evidence to suggest some other ultimate source. And to all appearances from the dispatch itself, it was nothing more. We would have to draw a baseless inference in the State's favor to conclude otherwise. The State presumably could have called a Concordia police officer or some other law enforcement agent to testify at the suppression hearing to establish the basis for the information contained in the dispatch about the collision and the identification of the suspect vehicle.

Law enforcement officers, of course, may rely on information from private citizens to furnish reasonable suspicion for making traffic stops. *State v. Slater*, 267 Kan. 694, Syl. ¶ 3, 986 P.2d 1038 (1999); *State v. Partridge*, 29 Kan. App. 2d 887, 891, 33 P.3d 862, *rev. denied* 272 Kan. 1422 (2001). The information from a citizen must, however, appear to be reliable. *Slater*, 267 Kan. at 706. In *Slater*, the Kansas Supreme Court identified three criteria to be considered in weighing the reliability of a citizen report of criminal activity:  (1) the status of the citizen reporter as known, ascertainable, or anonymous; (2) the level of detail the reporter provides about the wrongdoing; and (3) the degree of independent corroboration the law enforcement officer obtains before making the stop. 267 Kan. at 700.

In assessing reasonable suspicion and probable cause, courts disfavor anonymous tipsters, precisely because they are anonymous. 267 Kan. at 702. The veracity of unknown parties cannot be readily gauged. *Navarette*, 134 S. Ct. at 1688; *Florida v. J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). And the cloak of anonymity also shields tipsters from repercussions for delivering reckless or deliberately

6

false information. See K.S.A. 2015 Supp. 21-5904(1)(C) (criminalizing false reporting of information to law enforcement officer or agency to influence performance of duty); *J.L.*, 529 U.S. at 270. But an anonymous tip may support reasonable suspicion if it provides material details that law enforcement agents can independently corroborate, thereby boosting the reliability of the information as a whole. *J.L.*, 529 U.S. at 270 ("suitably corroborated" anonymous tip sufficiently reliable to furnish reasonable suspicion for investigatory stop); *Slater*, 267 Kan. at 702.

For example, the majority in *Navarette* found that an anonymous tip regarding a potential drunk driver was sufficiently reliable because it included a detailed description of the vehicle, including a tag number; the highway and direction in which the vehicle had last been traveling; and information indicating the tipster personally witnessed the events. Acting on a dispatch, a law enforcement officer located a vehicle fitting the description about 20 minutes later at a point on the highway where, based on the tip, it might reasonably have been expected. That, too, corroborated the tip, providing constitutionally adequate reasonable suspicion to stop the vehicle. *Navarette*, 134 S. Ct. at 1689. Four justices, allied in an especially withering dissent from Justice Scalia, would have found all of that information insufficient to render the traffic stop constitutionally acceptable. 134 S. Ct. at 1697 ("The Court's opinion serves up a freedom-destroying cocktail consisting of two parts patent falsity . . . ."). We needn't choose up sides on *Navarette* to say that the decision obviously undercuts the State's position in this case.

We, therefore, affirm the ruling of the district court granting Easterberg's motion to suppress.

7